NicholsoN, C. J.,
delivered the opinion of. the court.
On the 8th of November, 1867, Jos. L. Burts filed his attachment bill in the Chancery Court at Knoxville, against the Tennessee and Virginia Railroad Company, and attached in the hands of the East Tennessee and Virginia Railroad Company, funds belonging to the Tennessee and Virginia Railroad Company, to satisfy two notes of sixty-five dollars each, executed by the last named company, for the hire of two slaves. The funds so attached had been collected by the officers of the East Tennessee and Virginia Railroad Company for the Virginia and Tennessee Railroad Company for the transportation of freights and passengers.
Other attachment bills were filed by other parties attaching the same funds.
The complainants, trustees of the Virginia and Tennessee Railroad Company, filed their bill and obtained an injunction against the further prosecution of the several attachment bills, upon the ground that the fund so attached belonged to complainants by virtue of deeds of trust or mortgages executed by the railroad company to secure the payment of principal and interest of a large amount ol‘ bonds executed by the company in raising money to finish the construction of the road.
Defendants demurred to the bill and stated several causes of demurrer, upon the argument of which the Chancellor held that the same was well taken, and *425 dismissed the bill. From this decree complainants have appealed to this court.
"We proceed to consider the several grounds of demurrer relied on in this court for supporting the ruling of the Chancellor.
1. Because the deeds of trust under which complainants claim are in law fraudulent and void.
The property conveyed by the Virginia and Tennessee Railroad Company to complainants is thus described in the deeds': “The depot grounds and other lands acquired by said parties of the first part, for the purpose of the said road, the road bed, superstructure, iron, cars, engines, ■ locomotives, tenders and other things used in the management and business of the said road; also, all the franchises, appurtenances and privileges owned and to be owned by the said parties of the first part, at and between the said termini (Lynchburg and Bristol); and also property, rights and interests of every kind which the said parties of the first part may hereafter acquire, except such as may be acquired under authority to construct arms to said railroad other than those authorized by the original charter and the amendments thereto, and heretofore constructed, together with all tolls, issues, income and profits, which may be derived from the uses of the said road, or any part thereof, and from the after-acquired property, rights and interests, with the exception jjust stated.”
The conditions of the conveyance are then stated, ■with a recital of the bonds intended to be secured, as follows:
*426 “ And in case the parties of the first part shall fail to pay the principal of the said bonds, or any part thereof, or the interest thereon, as the same may become due and payable, when demanded, according to the tenor thereof, then after ninety days from such demand and default made, upon the request of the holder or holders of one-fourth in amount of the said bonds, the said trustees or their successors shall take possession of all or any part of the premises and property hereby granted, and by themselves or their agents, or substitutes duly constituted, have, use, and employ the same, according to the rules and regulations and lawful directions of the president and directors of the said company, and receive and collect the tolls, rents, income and profits of the said railroad and its appurtenances, and after defraying the expenses,” &c.
In construing this portion of the. trust deed, it is proper that we recur to the circumstances under which, and the purposes for which, the bonds were executed by the company and secured by the trust deeds. They had entered upon a great enterprise in the construction of a railroad from Lynchburg, in Virginia, to Bristol, on the border of Tennessee. This object could only be effected by raising money on the credit of the company, and to effect this it was necessary to issue their bonds payable at distant periods, but with the interest payable semi-annually. To induce capitalists to make investments in their bonds, it was necessary that they should be fully indemnified and secured • by mortgages on the property of the company. *427 The leading object of the capitalists was to have the interest promptly paid, and "the ultimate payment of the bonds fully secured.
The object of that provision of the deed just quoted was to secure the prompt payment of the interest. To effect this the trustees are empowered, in case of default, to take possession of the road, and to operate it by themselves or agents, for the purpose of appropriating the. income or profits to the satisfaction of the unpaid interest. To this provision no just exception can be taken. No presumption of fraud can arise, sither from the use of the road by the company for the purpose of raising the means of paying the interest as it accrues, or the bonds as they fall due; nor can any such presumption of fraud be deduced from the use of the road by the trustees or their agents, after default of payment of interest, for the purpose of providing the means of meeting the interest or paying the bonds.
But it is said that by the terms of the provision quoted, in the event of a default of payment of interest, the trustees are to take possession of the road, and they are to operate it under the direction of the president and directors of the company. If the language employed bears the interpretation that, in case of default of payment, the trustees are to be governed and controlled in their running of the road by the company, the presumption of fraud might very well be raised. But so extraordinary a provision would be so totally inconsistent with the leading object of the trust — the assurance of the prompt payment of the *428 interest — that it would be unreasonable to adopt such construction, unless the language used imperatively forces us to that interpretation.
The language used is, that “the said trustees or their successors shall take possession of all or any part of the premises and property hereby granted, and by themselves or their agents, or substitutes duly constituted, have, use and employ the same, according to th.e rules and, regulations and lawful directions of the president and directors of the said company.” This was a provision inserted for the benefit and protection of the company as to the manner in whifbh the road should be used and employed by the trustees in the event of their taking possession. It was assumed that the company would have adopted “rules, regulations and directions” for operating the road; and it was intended to require the trustees to have, use and employ the road according to these rules, regulations and directions already adopted, and not to adopt arbitrary rules and regulations of their own which might be destructive of the interests of the company. Upon this interpretation of the provision in the deed we are unable to see in it any badge of fraud.
2. The next provision in the trust deeds relied on to sustain the demurrer is as follows:
“And it is further stipulated and agreed that the parties of the first part may apply any money or personal property belonging to them to the construction and repair of the said railroad, or to its current expenses, or to the purchase of necessary machinery, or to the payment of its debts, or to furnishing and equip *429 ping the said road; and that all which may be received or acquired thereby, shall inure to and be held by the parties of the second part upon the trusts heTein declared.
“And it is also further agreed, that after deducting from the net profits of the said railroad an amount sufficient to pay the semi-annual interest on the bonds herein secured, which is pledged for that purpose, and also the further sum of one per cent, per annum on the amount of said bonds, which the parties of the first part covenant to lay aside as a sinking fund to provide for the payment of the principal of the said bonds, the parties of the first part may distribute the residue of said profits in payment of semi-annual dividends,” etc.
It is contended for defendant that, as no default is alleged in the bill to have occurred in the payment of interest, and as the trustees had taken no possession of the road on account of any default, but that the same was being operated by the company, the attachment levied upon the fund in controversy fixed upon it a lien superior to any ■ claim of the trustees. Counsel refers to 12 Pick., 451, in support of this position. We have not had access to this authority, but we find a ease in 23 Ill. R., 325, which substantially sustains the position. We quote from that case as follows:
“These deeds likewise contain a provision that future acquired property of the company, as well as that owned at the time, should be subject to all of these provisions. It was not, nor can it be claimed, *430 that at law any lien can be created, by this mode of sale or pledge, on property at the time having no existence, or not owned by the vendor or mortgager. By its rules all such efforts at a sale or mortgage are regarded as nothing more than a mere executory agreement for a sale; and, for its. breach, gives compensation in damages as for the non-performance of any other executory contract. But, on the contrary, if such a mortgage is so far executed, that the after-acquired property has passed into the hands of the mortgagee under the original mortgage, it has been held to create an equitable lien, which a court of chancery will recognize and enforce, unless prior liens have attached.”
This authority distinctly recognizes the doctrine, that in the case of the sale or mortgage of property not_ in existence at the time of the sale or mortgage, if, after it comes into existence and before it gets into the possession of the mortgagee or trustee, a lien is fixed upon it by a creditor of the vendor or mortgagor, this lien will prevail. Nor is this doctrine contradicted by the case in 26 Ill., 148, to which we have been referred by complainant’s counsel. In the latter, the fund attached had passed into the hands of the mortgagees, after default .of payment of interest and after the mortgagees had taken possession of the road. The equity of the mortgages was fixed upon the fund and their lien was therefore superior to that of the attaching creditor.
The case of Pennock v. Coe, 23 H., 117, decides that “a railroad company authorized to borrow *431 money and issue tbeir bonds to enable themselves to finish and stock the road, may mortgage as security, not only the then acquired property, but such as may be acquired in future.” We do not understand this doctrine to be controverted by defendant’s counsel, and we may remark, that in the case of Pennoek v. Coe, the locomotives and cars involved in the litigation, though not in existence when the mortgage was made, yet had been on the road in use more than two years before tbe judgment was rendered, under which they were sought to be appropriated. The simple question in that case was, whether the mortgagees Avcre entitled to the after-acquired property which was provided for by the terms of the mortgage.
But the case now under consideration presents another and a different question. That question is, When do the receipts of the road for freight and passage come under the lien of the trustees ? Is it as soon as it is received? when it is gross earnings? or when the expenses of the road have been paid, and the receipts become net profit? By the express terms of the deed the Tennessee and Virginia Railroad Company have the right, and it is their duty, to meet the eurrent expenses, to pay the debts, to repair the road, and to keep it equipped, and for these purposes they are to use the gross receipts or earnings of the road; and it is only after the net profits have been ascertained, that the lien of the mortgagees attaches. This, we think, is the plain meaning of the stipulations of the deed. To construe the deed as intending to fasten the lien of the mortgage on the gross *432 earnings, would result in depriving tlie company of appropriating them to the current expenses of the road, and effecting the objects and purposes of the deed itself. The mortgagees look to the net earnings of the road for the payment of their interest and their bonds. They agree that' the company shall operate the road, in order that net profits may be produced. To enable them to do this, they leave in the hands of the company the gross earnings to be used in meeting current expenses and debts.
By the very terms of the agreement, therefore, these gross earnings are to be appropriated to the debts contracted in running the road, and until they are so appropriated, and the net profits ascertained, the lien of the mortgages does not attach.
It follows that when defendant attached the fund in the hands of the Tennessee and Virginia Railroad Company, he fixed upon it a prior lien, which he has a right to have satisfied by the appropriation of so much of the fund as is equal to his claim. This ground of demurrer was therefore well taken, and the same was properly sustained.
Let the decree be affirmed with costs.